UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 21-101 (JRT/DTS)

UNITED STATES OF AMERICA,

               Plaintiff,

   v.

               **GOVERNMENT'S
               TRIAL BRIEF**

JEREMY WADE WILSON,

               Defendant.

Between 2013 and 2019, Defendant Jeremy Wilson participated in a telemarketing fraud scheme.  Mr. Wilson and his company, Publishers Elite, accomplished the fraud scheme by calling victim-consumers who had one or more existing magazine subscriptions and offering to "renew" the existing magazine subscriptions at a "preferred rate."  In reality, Mr. Wilson and his telemarketers were not calling to renew or reduce the price of the existing subscriptions.  Instead, they tricked victims into signing up for entirely new magazine subscriptions, which the victims did not want and often could not afford.

Through this scheme, Mr. Wilson and his company stole more than $4.8 million from more than 14,000 victims, who were disproportionately elderly and otherwise vulnerable.  He has been charged with six counts of wire fraud.

## I.  ANTICIPATED FACTS AT TRIAL

### A.  **Publishers Elite**

Prior to 2013, Mr. Wilson and a business partner co-owned Publishers Preferred, a magazine subscription sales company.  Mr. Wilson, however, decided to strike out on his own.  He launched Publishers Elite, which similarly engaged in

magazine-based telemarketing.  Publishers Elite ran a telemarketing call center in Arlington, Texas.

Mr. Wilson was the sole owner of Publishers Elite from its inception, in 2013, through its closure, in 2019.  During this period, Publishers Elite charged customers more than $4.8 million.

### B.     The Fraud Scheme

Publishers Elite earned those profits through fraudulent sales.  Mr. Wilson provided his telemarketers with sales scripts containing fraudulent sales pitches designed to trick victim-consumers into unwittingly signing up for expensive magazine subscription packages.

As Mr. Wilson's former employees explain, Publishers Elite placed two kinds of "residential"—that is, direct to consumer—calls: new sales and renewals.  "New sales" calls were to prospective customers who Publishers Elite knew were receiving magazines through separate providers, but who had no existing relationship with Publishers Elite; "renewals" were for individuals with existing subscriptions through Publishers Elite.   For both "new sales" and "renewals" calls, Publishers Elite telemarketers used the same script:

Hi this is _____ with publishers we service your _____ magazine, the reason I'm calling is doing a brief service check. Is your _____ magazine still coming in on time and OK? Good! Are you still enjoying the magazine? Great glad to hear that I know you've had it for quite a while now.

If Fact the last time you renewed your _____ you paid for 3 years back in_____ of _____, do you remember that? You got a professional rate, the rate we give to all our teachers and seniors it was just _____ per year. Unfortunately in the past 3 years we have had 2 stamp increases. The current renewal cards are going out at ____ per year. So as a preferred customer and longtime subscriber we are going to keep you at the exact same rate you paid 3 years ago just ____ per year. As always that rate is guaranteed for the full 36 month 3 year renewal, so no matter how high the _____ goes you're always guaranteed the same rate. That sounds great doesn't it?

You won't get double copies and you won't lose any credit for time you have left it just adds on to the end of your current service. Now someone from my processing department is going to call you right back, they are going to make sure I was polite and that I didn't promise you a new car or a million dollars. They will verify your address for delivery and set up a billing that is convenient for your OK!

Great someone will call you right back, thank you for your order and enjoy your

_____.

When used for so-called "new sales" calls, the script was undeniably deceptive and misleading. The Publishers Elite telemarketers pretended to be calling from the victims' *existing* magazine service about an *existing* subscription. They then offered to "renew" the victims' subscriptions at the "preferred rate" of just $24.95. Those were lies. Mr. Wilson and his employees were not calling to renew or reduce the price

3

of an *existing* subscription. Instead, they tricked their victims into signing up for entirely *new* magazine subscriptions.

When used for "renewal" calls, the script was similarly false and misleading. Although Publishers Elite typically signed up victim-consumers for a three-year contract term ("the full 36 month 3 year renewal"), Mr. Wilson directed his telemarketers to place "renewal" calls every six months. Each time, the telemarketer would falsely state that the victim-consumer's magazine subscription was set to expire. Further, although the Publishers Elite telemarketers promised the victim-consumers that they "won't get double copies" because the "renewal" simply "adds on to the end of your current service," in truth, Publishers Elite often signed the victims up for entirely new subscriptions.

As Mr. Wilson's former employers admit—and as the customer data reflects—this scheme worked particularly well on the elderly and vulnerable, who were more likely to be confused and deceived by the lie.

### C.   Mr. Wilson's Role in the Company

The former Publishers Elite employees explain that Mr. Wilson "started the company and came up with the approach to selling the magazines." They describe Mr. Wilson as the "mastermind" behind the fraud. He bought and provided the lead lists—that is, the list of prospective victims that his telemarketers were instructed to call. He wrote the script and instructed employees how to use it. Indeed, he personally placed thousands of sales calls using his fraudulent script. He owned and operated the company and benefitted the most from the company's fraudulent business practices. In short, he "called all the shots." As one employee stated, "it was

4

his show."

Moreover, Mr. Wilson was appraised of the complaints customers leveled against his company. And he devised a particularly nefarious tactic to combat such complaints. Publishers Elite telemarketers recorded the final portion of each sales call—where customers confirmed the order—while omitting the initial, fraudulent pitch. When customers complained or reported the charges as fraudulent to their financial institutions, Publishers Elite would replay the recording to claim that the victim-consumers had, in fact, agreed to the charges. The company's elderly, vulnerable victims often found themselves incapable of pushing back against the lies and deceit.

To a person, the former Publishers Elite employees assert that Mr. Wilson knew his company was lying to people to get their money. Any claim to the contrary, they explain, is patently untrue.

### D.   The Victims

The investigation into the criminal scheme charged in this case exposed the scope of the fraud. Through grand jury subpoenas, the government obtained financial records for Publishers Elite as well as the records of customer charges imposed by Publishers Elite, as maintained by the company's customer relationship management platform, PSOnline. Those records establish that between 2013 and 2019, Publishers Elite collected more than $4.8 million from its victim-consumers.

Moreover, the records evidence the predatory nature of Mr. Wilson's fraudulent scheme. For example, between February 2014 and January 2019, Publishers Elite charged victim Betty M. 59 times. That includes the following six

charges:

| No. | Date | Amount |
|-----|------|--------|
| 1 | October 19, 2017 | $387.52 |
| 2 | November 22, 2017 | $387.52 |
| 3 | December 22, 2017 | $387.52 |
| 4 | January 22, 2017 | $387.52 |
| 5 | July 27, 2018 | $387.52 |
| 6 | August 28, 2018 | $387.52 |

Those are the charges underlying the six counts of wire fraud alleged in the Superseding Indictment.

Publishers Elite processed its charges to Betty M. through 15 different "order numbers"—that is, 15 distinct magazine subscription accounts. The company also created separate "customer numbers" for Betty M., modifying her name slightly to create the impression that they were charging separate individuals. Betty M.'s personal financial records confirm that despite the attempted subterfuge, all 59 charges were imposed on Betty M.'s account. In total, over less than five years, Publishers Elite charged Betty M. $14,735.63.

## II.   TRIAL COUNSEL

The United States will be represented at trial by the following Assistant United States Attorneys:

Garrett S. Fields                        Matthew C. Murphy
300 S. 4th St., Suite 600          300 S. 4th St., Suite 600
Minneapolis, MN  55415          Minneapolis, MN  55415
Tel:  612-664-5600                   Tel:  612-664-5600
garrett.fields@usdoj.gov          Matthew.Murphy2@usdoj.gov

Melinda A. Williams
300 S. 4th St., Suite 600
Minneapolis, MN  55415
Tel:  612-664-5600
melinda.williams@usdoj.gov

## III.   LENGTH OF TRIAL

The government anticipates that its case-in-chief will last approximately three to four days.

Date: May 13, 2024                    Respectfully submitted,

ANDREW M. LUGER
United States Attorney

BY:  /s/ *Garrett S. Fields*
GARRETT S. FIELDS
MATTHEW C. MURPHY
MELINDA A. WILLIAMS
Assistant U.S. Attorneys